IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSEPH DeMAIO,<br><br>       Plaintiff,<br><br>   v.<br><br>JO ANNE B. BARNHART,<br>COMMISSIONER OF<br>SOCIAL SECURITY,<br><br>       Defendant. | HONORABLE NOEL L. HILLMAN<br><br>CIVIL NO. 05-4580<br><br><br>**OPINION** |

APPEARANCES:

Robert A. Petruzzelli, Esq.
Ten Melrose Avenue
Suite 340
Cherry Hill, New Jersey 08003
     Attorney for Plaintiff

Christopher J. Christie
United States Attorney
     By:  Dennis J. Canning
          Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
     Attorney for Defendant


**HILLMAN**, District Judge:

     This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. §405(g),

to review the final decision of the Commissioner of the Social Security Administration, denying the application of the plaintiff, Joseph DeMaio, for Disability Insurance Benefits under Title II of the Social Security Act.  42 U.S.C. § 401, et seq. This Court must determine: (1) whether the Administrative Law Judge ("ALJ") erred in evaluating Plaintiff's severe non-exertional impairments; (2) whether the ALJ failed to properly weigh the medical evidence of record; (3) whether the ALJ failed to properly determine the Plaintiff's residual functional capacity; (4) whether the ALJ relied on flawed vocational expert testimony; and (5) whether the administrative record provides sufficient basis for an award of summary judgment in favor of Plaintiff.  For the reasons stated below, this Court will affirm the decision of the Commissioner denying Plaintiff's application for Disability Insurance Benefits.

**I. Background**

    A. <u>Procedural History</u>

Plaintiff filed his application for Disability Insurance Benefits ("DIB") on February 21, 2003, with an alleged disability onset date of November 15, 2002.  The Plaintiff alleged severe impairments from cervical radiculopathy, bilateral carpal tunnel syndrome, status post carpal release, fusion, ulnar transposition and status post motor vehicle accident dysthymic disorder, all

2

stemming from a motor vehicle accident on March 8, 1999.

Plaintiff's application for DIB was denied initially and also upon reconsideration.  A hearing was timely requested and held before an Administrative Law Judge ("ALJ") on January 27, 2005 in Voorhees, New Jersey.

The ALJ issued a decision denying benefits to Plaintiff on March 24, 2005, holding that while Plaintiff's physical impairments were in fact "severe," the Plaintiff nonetheless retained the requisite residual functional capacity to perform a significant range of sedentary work in the national economy.  As such, the Plaintiff was found "not disabled" under the Social Security Act and without entitlement to DIB.

Plaintiff filed a request for review of the ALJ's decision to the Appeals Council on May 18, 2005.  The request was denied on August 4, 2005.  Plaintiff then filed the present action with this Court on September 20, 2005.

    B. <u>Evidence in the Record</u>

        1. <u>Plaintiff's Examination By His Attorney</u>

In response to questioning by his attorney, Plaintiff testified that he was born on November 11, 1956, making him 48 years old at the time of the hearing.  (R. at 34.)  In 1976 Plaintiff graduated from a vocational high school specializing in auto mechanics. (<u>Id.</u>)  Plaintiff did not enter the field of auto

mechanics.  (Id.)  Instead, Plaintiff worked as a truck driver his entire life, starting in 1977 and stopping in 2002.  (R. at 34-35.)

Plaintiff testified that he had to stop working because of an accident in 1998.  (R. at 35.)  While making deliveries for his employer, Multi-Food Distribution, he stopped at a red light in West Chester, Pennsylvania where he was rear-ended by another tractor trailer. (Id.)  According to Plaintiff, the impact from the other vehicle "rendered [him] unconscious, shoved [him] through the red light, did extensive damage" and "totaled the trailer [he] was towing."  (Id.)  He further asserts that this was the beginning of the pain in his neck, shoulders and arms. (R. at 35.)  Furthermore, Plaintiff claims that as a result of the collision his right hand came off the shifter and "punched" the dashboard, injuring that hand.  (Id.)

Plaintiff testified that after the accident he returned to work, and at some point thereafter took time off in order to have various medical operations: "carpal tunnel [release]," an ulnar nerve transplant, and a "discopathy in C4 and 5 (vertebrae)." (R. at 36.)  Plaintiff testified that he had also gone to see Dr. Kenneth Rogers in Cherry Hill, New Jersey, who administered a "trial spinal cord stimulator."  (R. at 37.)  According to Plaintiff, the spinal cord stimulator did not provide enough pain

4

relief for its permanent installment to be a viable option.   (R. at 37-38.)

Following the operations, Plaintiff went back to working in 2001 as a truck driver for about six months.  (R. at 36.) Because of the "bustling of the truck," Plaintiff's pain (neck, elbows, hands, etc.) got "worse and worse and worse."  (R. at 37.)  Plaintiff sought treatment in the form of "pain management" from Dr. Hairston, who performed some tests and concluded that Plaintiff should not continue to work as a truck driver.  (Id.) Plaintiff testified that at the time he stopped working as a truck driver, his annual salary before taxes was $52,000.  (R. at 38.)

On a scale of one to ten, with ten being the worst, Plaintiff testified that his average daily pain was around "seven, seven and a half." (R. at 38-39.)  On bad days, stated Plaintiff, the pain "gets to a ten."  (R. at 39.)  Plaintiff testified that on an average day, he is only able to do his daily activities (vacuuming, laundry, etc.) "in spurts."  (Id.) Plaintiff further explained that by the end of every day "[i]t feels like I got twenty-five pound weights hanging on my arms when they're down."  (R. at 40.)  Plaintiff testified that after the carpal tunnel surgery he still had problems with his hands and "fine motor skills," only being able to "write out two or

three checks a day" because his "fingers get sore" and "numb."
(Id.)  Plaintiff further stated that because of the pain in his
hands, elbows and shoulders, he has been unable to "get a full
night's sleep."  (R. at 41.)  Plaintiff testified that he takes
five milligrams of Topamax, a muscle relaxer prescribed to him by
Dr. Hairston, twice every day in order to sleep better.  (R. at
41-42).

Plaintiff testified that before his accident he enjoyed
riding his motorcycle every day, often taking long trips to
Wilkes-Barre and Harrisburg, Pennsylvania on the weekends.  (R.
at 42.)  Plaintiff said that it had been a couple of years since
he had taken "one of those long trips," and that it had been one
year since he had taken a local trip "around the block" on his
motorcycle.  (R. at 42-43.)  Plaintiff testified that he went to
see Dr. Toby, who described some emotional difficulties Plaintiff
was having as a result of the injury.  (R. at 43.)  Plaintiff
stated that these difficulties revolved around his inability to
do certain activities, like riding his motorcycle or carpeting
work around the house.  (Id.)  He also stated that the
dissolution of his marriage after the accident might be a
contributing factor to any emotional difficulties he was having.
(R. at 46.)

Plaintiff testified that he used to help friends do their

6

own household work, but is no longer able to.  (R. at 44.)
Plaintiff further testified that he mows the grass utilizing a
riding mower, but what used to take him two hours now takes him
all day because he must periodically stop.  (Id.)  When it snows,
his cousin must clear the driveway for him.  (R. At 45.)  He
stated that he is able to do his own laundry and shop for
groceries, though he only picks up a few items at the store.
(Id.)

Plaintiff testified that Dr. Hairston told him to not lift
certain amounts of weight or to drive.  (R. at 46.)  Plaintiff
stated that he was able to carry the six or seven pound laundry
detergent bottles he gets from the store, but that he would be
unable to carry one around all day if he had to.  (Id.)  He
further stated that he thought he would be unable to carry
something that weighed twenty pounds, and that he had not tried
to lift anything heavy recently.  (R. at 47.)  Plaintiff
testified that when he lifts something too heavy, he feels
problems with his shoulders and neck.  (Id.)  He feels restricted
in the range of motion with his neck from the surgery, and
experiences pain down the center of his spine when looking up or
down for too long.  (Id.)  Plaintiff testified that he could not
sit at a table and read a book or newspaper for twenty minutes
without pain starting to shoot down his back.  (R. at 48.)

7

Plaintiff testified that the pain medication he takes impairs his ability to concentrate, but that without it he suffers "muscles spasms" that make the pain worse. (Id.) He further testified that he has found limitations in the range of motion in his elbows, and that his hands are "constantly sore." (R. at 49.)

### 2. Plaintiff's Examination By the ALJ

In response to questioning by the ALJ, Plaintiff testified that he had not seen Dr. Hairston in over a year. (Id.) Plaintiff stated that the reasons for this were that it would be "wasting [his] money" because Dr. Hairston said his condition would not improve, and also that the pain has not gotten worse since his last visit. (Id.) Plaintiff still calls Dr. Hairston each month, though, to get a prescription filled. (Id.) Plaintiff testified that currently he is not being treated by a doctor. (R. at 50.)

Plaintiff testified that at one time he was seeing Dr. Morris Antevy, who attempted to treat Plaintiff with acupuncture and prescriptions for Trazadone and Clonidine. (Id.) Plaintiff found the acupuncture and Trazadone ineffective, and did not attempt to try the Clonidine. (Id.) Plaintiff testified that his family physician was Dr. Patel, who he sees every three months and who prescribes him Zocor for high cholesterol. (R. at

8

50-51).  Plaintiff testified that he currently does not see a
psychiatrist or a psychologist, and that he has never done so in
the past.  (R. at 51).  Plaintiff also stated that he has a
pending worker's compensation claim.  (Id.)

   3. Testimony of Vocational Expert Mitchell Schmidt

  Plaintiff's attorney reviewed Mr. Schmidt's qualifications
as a vocational case manager, and stipulated to those
qualifications for the purpose of Mr. Schmidt's expert testimony.
(R. at 52).  Mr. Schmidt reviewed the vocational evidence
presented in Plaintiff's case, heard Plaintiff's testimony, and
described Plaintiff's prior work experience.  (R. at 53).  Mr.
Schmidt testified that during the past 15 years, Plaintiff had
worked as a heavy truck driver, DOT code 905663014.  (Id.)  Mr.
Schmidt described this type of work as "medium duty work, semi-
skilled" according to the Dictionary of Occupational Titles, but
that based on Plaintiff's vocational record it was performed at
the "heavy duty exertion level." (Id.)  Mr. Schmidt stated that
for purposes of his testimony he would be using the region of
Burlington, Camden, Gloucester, and Salem Country for an
"occupational area," that information being provided to him by
the New Jersey Department of Labor.  (R. at 54).

  The ALJ posed questions to Mr. Schmidt involving a
hypothetical individual whose intellectual and physical

capabilities were roughly equivalent to the Plaintiff's.  (Id.)
In response, Mr. Schmidt testified that such a hypothetical
individual could not perform the past relevant work of the
Plaintiff, but that there were other jobs existing in the
regional or national economy that such an individual could
perform, such as "surveillance systems monitor," "microfilming
document preparer," and "call out operator."  (R. at 54-55.)  Mr.
Schmidt further testified that the aforementioned jobs were
"sedentary" and "unskilled" in classification.  (R. at 55.)  In
response to slight alterations of the hypothetical by the ALJ,
Mr. Schmidt testified that if the individual were only able to
horizontally reach and feel objects bilaterally on a "frequent
basis" it would not change his answers to the previous questions.
(R. at 55-56.)  If the hypothetical individual were only able to
horizontally reach and feel objects bilaterally on an "occasional
basis," Mr. Schmidt testified that the individual would not be
able to perform the microfilming document preparer position.  (R.
at 56.)  Lastly, Mr. Schmidt testified that if the hypothetical
individual were required to take frequent unscheduled breaks
during the day or could not be regular in attendance, that those
characteristics would preclude employment.  (Id.)

C. Medical Records

Plaintiff's impairments originate with a motor vehicle

10

accident on March 8, 1998.  According to the report of Dr.
Marshall Pressman, Plaintiff was evaluated on April 17, 2001 by
Dr. Mark K. Levitsky. (R. at 184.)  Dr. Levitsky noted that in
his opinion, Plaintiff did "not require any surgical
intervention" and that he was "fully capable of continuing to be
gainfully employed."  (Id.)  In a report dated September 19,
2001, Dr. Jean Shor noted the results of a chest x-ray
"unremarkable." (R. at 163.)  Plaintiff underwent carpal tunnel
release in his left arm in October 2001, and in his right arm in
November 2001.  (R. at 186.)  An EMG and nerve conduction study
was performed on December 17, 2001 by Dr. Bruce M. Hairston, and
revealed "tenderness over the left medial epicondyle[1] and a
positive Tinel's[2] at the left elbow," as well as a left ulnar
neuropathy at the elbow.  (Id.)

In Dr. Fernando Delasotta's report dated February 27, 2002,
he found that Plaintiff appeared to be in 'no acute distress,'
had restricted range of motion in the neck, normal range of
motion in the back, and decreased sensation in the left bicep
muscle.  (R. at 138.)  An MRI of Plaintiff's cervical spine

---

[1] "A projection from a long bone near the articular
extremity." *Stedman's Medical Dictionary* 603 (27th Edition,
2000).

[2] "A sensation of tingling, or of 'pins and needles,' felt
at the lesion site or more distally along the course of a nerve
when the latter is percussed." *Id.* at 1640.

revealed disc protrusion between the C5-6 and C6-7 vertebrae.
(R. at 137.)  As a result, Dr. Delasotta diagnosed Plaintiff with
"cervical radiculopathy[3]."  (R. at 138.)  On September 25, 2002,
Plaintiff again saw Dr. Hairston.  (R. at 188.)  Dr. Hairston
noted Plaintiff's improvement since surgery, but still found the
existence of neck pain and cervical myofascial pain syndrome[4].
(Id.)  Dr. Hairston suggested that Plaintiff would need trigger
point injections, and prescribed him Percocet and Flexeril[5] as
well.  (R. at 189.)  Therapy was also planned for the Plaintiff.
(Id.)

        In the report from an orthopedic examination dated March 25,
2003, Dr. Nithyashuba Khona noted that the Plaintiff was "able to
do cooking, cleaning, laundry, shop for food, shower, bathe, and
dress," and that "[d]aily he watches TV, listens to the radio,
and reads."  (R. at 165-66.)  Dr. Khona noted that Plaintiff
appeared to be in "no acute distress," with a normal gait and
station, and possessed the ability to fully squat, change for the
exam, move onto and off of the exam table, and "rise from a chair

_____

        [3] Disorder of the "nerve roots and nerves" in the cervical
spine.  *Id.* at 1503.

        [4] Pain in the "sheet of fibrous tissue...surrounding and
separating" the neck muscles.  *Id.* at 647, 1173.

        [5] *Cyclobenzaprine HCl*. A "white, crystalline tricyclic amine
salt" that "relieves skeletal muscle spasm of local origin."
*Physicians' Desk Reference* 1832 (60th ed.2006)

without difficulty." (R. at 166.) Dr. Khona further noted that Plaintiff could walk on both his toes and heels, that his hand and finger dexterity were intact with a "grip strength" of 5/5 bilaterally, and that Plaintiff had full range of motion in his shoulders, elbows, forearms, back, hips, knees, ankles, wrists and fingers bilaterally. (Id.) Also, there appeared to be no muscle atrophy in the upper extremities. (Id.) Dr. Khona also noted that Plaintiff was able to drive himself to the exam. (R. at 167.)

In a letter to Dr. Delasotta dated July 9, 2003, Dr. Hairston noted after a follow up examination of Plaintiff that there was nothing he could do to help Plaintiff. (R. at 176.) Dr. Hairston wrote that "[e]ven the use of opioids has been unsuccessful in truly managing his pain. I could increase the dose, however, I do not feel that I will change the severity of his discomfort." (Id.) Plaintiff was re-evaluated by Dr. Delasotta on April 21, 2003, and placement of a spinal cord stimulator was scheduled. (R. at 191.) In his report dated July 27, 2004, Dr. Pressman evaluated Plaintiff and found his vital signs intact. (R. at 193.) Dr. Pressman noted that Plaintiff was "capable of opposing all fingers to the thumbs bilaterally," and that there was "diminished sensation to pinprick about the upper extremities bilaterally." (Id.) Dr. Pressman's final

13

diagnosis of Plaintiff's infirmities was orthopedic residual of a decompensated cervical spine, ulnar neuropathy[6] involving the left elbow, a positive EMG for bilateral median nerve entrapment, and right carpal tunnel syndrome.  (R. at 194-95.)  Dr. Pressman noted that in his opinion, Plaintiff's injuries "have resulted in demonstrable objective medical evidence of restricted function and lessening to a material degree of working ability."  (R. at 195.)

In a letter dated September 27, 2004, Dr. Edward H. Tobe, a psychiatrist, described his evaluation of Plaintiff following an examination that day.  (R. at 197.)  Dr. Tobe noted that Plaintiff sometimes has trouble sleeping, and that he has pain in the neck and shoulders.  (Id.)  Dr. Tobe noted that Plaintiff appeared to be "somewhat muscular in his upper extremities," but that there was "definitive weakness bilaterally to his grip."  (R. at 198.)  During the interview there was no "bizarre psychomotor activity, and a neurological examination found Plaintiff's gait to be normal.  (Id.)  Dr. Tobe found Plaintiff to be "depressed," though, and "worried about his long-term disability running out."  (Id.)  He also found Plaintiff to be "very wounded" about the dissolution of his last marriage.  (Id.)

---

[6] "A classical term for any disorder affecting any segment of the nervous system."  *Stedman's* at 1211.

14

His "thoughts were always coherent and goal-directed," and there was "no evidence of any psychotic disorder, no evidence of delusions or hallucinations." (Id.)  Dr. Tobe ultimately diagnosed Plaintiff as having a "50 percent permanent of total psychiatric disability," and raised "significant concerns about his employability." (R. at 198.)

## II. Discussion

    A.   Standard of Review

Under 42 U.S.C. § 405(g), Congress provided for judicial review of the Commissioner's decision to deny a complainant's application for Disability Insurance Benefits. Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must uphold the Commissioner's factual decisions where they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial evidence means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.  The inquiry is not whether the reviewing court would have made the same determination, but whether the

Commissioner's conclusion was reasonable.  See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

A reviewing court has a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). "[A] court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951)).

The Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The Third Circuit has held that an "ALJ must review all pertinent medical evidence and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).  Similarly, an ALJ must also consider and weigh all of the non-medical evidence before him.  Id. (citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)); Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981).

The Third Circuit has held that access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all

16

> evidence and has sufficiently explained the
> weight he has given to obviously probative
> exhibits, to say that his decision is
> supported by substantial evidence approaches
> an abdication of the court's duty to
> scrutinize the record as a whole to determine
> whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).  Although an

ALJ, as the fact finder, must consider and evaluate the medical

evidence presented, Fargnoli, 247 F.3d at 42, "[t]here is no

requirement that the ALJ discuss in its opinion every tidbit of

evidence included in the record," Hur v. Barnhart, 94 Fed. Appx.

130, 133 (3d Cir. 2004).  In terms of judicial review, a district

court is not "empowered to weigh the evidence or substitute its

conclusions for those of the fact-finder."  Williams, 970 F.2d at

1182.

Apart from the substantial evidence inquiry, a reviewing

court is entitled to satisfy itself that the Commissioner arrived

at his decision by application of the proper legal standards.

Sykes, 228 F.3d at 262; Friedberg v. Schweiker, 721 F.2d 445, 447

(3d Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J.

1981).

B.   Standard for Disability Insurance Benefits

The Social Security Act defines "disability" for purposes of

an entitlement to a period of disability and disability insurance

benefits as the inability to engage in any substantial gainful

17

activity by reason of any medically determinable physical and/or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See 42 U.S.C. § 1382(a)(3)(A).  Under this definition, a claimant qualifies as disabled only if his physical or mental impairments are of such severity that he is not only unable to perform his past relevant work, but cannot, given his age, education, and work experience, engage in any other type of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations for determining disability that require application of a five-step sequential analysis.  See 20 C.F.R. § 404.1520.  This five-step process is summarized as follows:

1.  If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."

2.  If the claimant does not suffer from a "severe impairment," he will be found "not disabled."

3.  If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."

4.    If the claimant can still perform work he has done in
      the past ("past relevant work") despite the severe
      impairment, he will be found "not disabled."

5.    Finally, the Commissioner will consider the claimant's
      ability to perform work ("residual functional
      capacity"), age, education, and past work experience to
      determine whether or not he is capable of performing
      other work which exists in the national economy.  If he
      is incapable, he will be found "disabled."  If he is
      capable, he will be found "not disabled."

20 C.F.R. § 404.1520(b)-(g).  Entitlement to benefits is

therefore dependent upon a finding that the claimant is incapable

of performing work in the national economy.

     This five-step process involves a shifting burden of proof.

See Wallace v. Secretary of Health & Human Servs., 722 F.2d 1150,

1153 (3d Cir. 1983).  In the first four steps of the analysis,

the burden is on the claimant to prove every element of his claim

by a preponderance of the evidence.  See Id.  In the final step,

the Commissioner bears the burden of proving that work is

available for the plaintiff: "Once a claimant has proved that he

is unable to perform his former job, the burden shifts to the

Commissioner to prove that there is some other kind of

substantial gainful employment he is able to perform."  Kangas v.

Bowen, 823 F.2d 775, 777 (3d Cir. 1987); see Olsen v. Schweiker,

703 F.2d 751, 753 (3d Cir. 1983).

     Here, the ALJ found that Plaintiff had not been under a

disability as defined in the Social Security Act at any time since his alleged onset date of disability, i.e., November 15, 2002, through the date of the decision.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful employment since the alleged onset of his disability.  At step two, the ALJ found that Plaintiff's cervical radiculopathy, bilateral carpal tunnel syndrome, status post carpal release, fusion, ulnar transposition and status post motor vehicle accident were "severe" according to the requirements in the Regulations.  At step three, however, the ALJ determined that the aforementioned medically determinable impairments did not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  At step four, the ALJ found that the Plaintiff had carried his burden in showing that he was unable to perform any of his past relevant work.  The case was ultimately decided by step five, though, where the ALJ found that Plaintiff possessed the residual functional capacity to perform a significant range of sedentary work and that there are a significant number of jobs in the national economy that Plaintiff can perform.  As a result, the ALJ found that Plaintiff was not entitled to Disability Insurance Benefits.

C.   Plaintiff's Arguments

Plaintiff's brief makes five arguments as to why the ALJ's finding that Plaintiff is not eligible for disability benefits is incorrect.  First, Plaintiff argues that the ALJ erred in evaluating Plaintiff's severe non-exertional impairments. Second, Plaintiff argues that the ALJ failed to properly weigh the medical evidence of record.  Third, Plaintiff argues that the ALJ failed to properly determine the Plaintiff's residual functional capacity.  Fourth, Plaintiff argues that the ALJ relied on flawed vocational expert testimony.  Fifth, Plaintiff argues that the administrative record provides sufficient basis for an award of summary judgment in Plaintiff's favor.  For the following reasons, this Court will affirm the decision of the ALJ and Plaintiff's application will be denied.

## 1.   **Whether the ALJ erred in evaluating Plaintiff's severe non-exertional impairments**

Plaintiff argues that the ALJ erred in finding that Plaintiff's dysthymic disorder imposed no limitations on his ability to perform basic work-related activities, and as such was not a "severe impairment for purposes of this analysis."  (Pl. Br. at 12 (quoting R. at 18).)

It is well settled that the ALJ must set out a specific factual basis for each finding.  Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975); Root v.

21

Heckler, 618 F. Supp. 76, 79 (D. Del. 1985).  However, the ALJ
need not explicitly discuss every single piece of evidence from
the record in his opinion.  Fargnoli, 247 F.3d at 42.
Furthermore, this Court is bound by the ALJ's findings of fact if
they are supported by substantial evidence in the record.
Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  When a
conflict in the evidence exists, the ALJ may choose whom to
credit but "cannot reject evidence for no reason or for the wrong
reason."  Id. at 429, quoting Mason, 994 F.2d 1058, 1066 (3d Cir.
1993).

During a clinical examination by evaluating psychiatrist Dr.
Tobe, Plaintiff was diagnosed with a dysthymic disorder, a mild
form of depression.  (R. at 198.)  Dr. Tobe opined that Plaintiff
had a 50% psychiatric disorder, which imposed a restriction on
his employability.  (Id.)  Although Plaintiff relies on Dr.
Tobe's diagnosis to support his argument, the ALJ properly found
the record to be devoid of an explanation as to how the alleged
psychological impairment would negatively impact his ability to
work.  The ALJ even uses Dr. Tobe's own observations to note
that Plaintiff's "memory skills are intact (sic) and his thoughts
(sic) processes are coherent and goal directed ... he takes no
medication for his depression and has not been treated for it."
(R. at 22.)  Dr. Tobe found "no evidence of any psychotic

22

disorder, no evidence of delusions or hallucinations." (R. at 198.)

Furthermore, Plaintiff does not even suggest in his brief that there is any substantive, factual evidence supporting a position contrary to the ALJ, and only asks this Court to assume that an individual with depression-like symptoms will be more than minimally affected in their "ability to do basic work activities." (Pl. Br. at 12.) Making such assumptions is outside the scope of the instant review. Here, the ALJ's finding that Plaintiff's dysthymic disorder is not "severe" is supported by substantial evidence and, consequently, must be upheld.

Plaintiff further argues that the ALJ failed to evaluate Plaintiff's diagnosis of chronic pain at step two of the sequential evaluation. (Pl. Br. at 12.) While the ALJ is required to give serious consideration to a claimant's subjective complaints of pain, he is not bound to accept unquestioningly the credibility of such subjective evidence. Welch, 808 F.2d at 270; Marcus, 615 F.2d at 27. More important to the merits of the contention is that this Court will only reverse an ALJ's findings with regard to subjective complaints of pain if those findings are not supported by "substantial evidence." Dumas, 712 F.2d at 1552.

Here, the ALJ did not find Plaintiff's subjective complaints

to be credible based on the testimony and medical records presented, as well as Plaintiff's demeanor at the hearing.  (R. at 21.)  The ALJ noted that Plaintiff was able to cook, clean, do the laundry, shop for food and mow the lawn.  (R. at 22.) Evidence of muscle atrophy was not presented, and "signs of muscle wasting or atrophy are usually observed when pain is severe and functionally limiting."  (Id.)  The ALJ also noted that while Plaintiff testified to being unable to sit for more than twenty minutes due to his pain, Plaintiff was "able to sit through the forty minute hearing without any signs of distress." (R. at 22.)  Thus, the ALJ's finding that Plaintiff's "chronic pain" is not "severe" is supported by substantial evidence and must therefore be affirmed.

### 2.   Whether the ALJ failed to properly weigh the medical evidence of record

Plaintiff argues that the ALJ erred in affording little weight to either Dr. Pressman's or Dr. Tobe's medical assessment of Plaintiff's condition.

The Social Security Administration regulations regarding the evaluation of evidence from treating physicians are found in 20 C.F.R. 404.1527.  The case law is clear on the disparate reliance to be given to "treating physicians" versus "non-treating physicians":

> [T]he opinions of physicians or psychologists
> who do not have a treatment relationship with
> the individual are weighed by stricter
> standards ... than are required of treating
> sources.

(SSR 96-6p, 2); see also Mason, 994 F.2d at 1067; Kane, 776 F.2d

at 1135; Adorno, 40 F.3d at 47. ("In considering a claim for

disability benefits, greater weight should be given to the

findings of a treating physician than to a physician who has

examined the claimant as a consultant.") Thus, an ALJ is allowed

greater discretion when assigning weight to the opinions of non-

treating physicians.

Regardless, an ALJ must analyze all of the evidence in the

record and provide an adequate explanation for disregarding

evidence.  Id. at 48.  One explanation accepted by the Third

Circuit is that an "unsupported diagnosis" is not entitled to

significant weight.  Jones v. Sullivan, 954 F.2d 125, 129 (3d

Cir. 1991).  In Jones, the Court noted that evidence of the

claimant's alcohol abuse was insufficient to establish his

entitlement to disability benefits absent a showing that his

drinking affected his ability to work.  (Id.)

Here, neither Dr. Pressman nor Dr. Tobe qualify as treating

physicians for the purposes of this analysis because they only

examined Plaintiff one time.  Plaintiff does not disagree with

this fact, and only argues that the ALJ placed greater weight on

25

the medical opinion of Dr. Khona, also a one-time examiner, than
on the opinions of the aforementioned doctors.  The ALJ noted in
his decision that he assigned "little weight" to the assessments
of Drs. Pressman and Tobe because they were "not based on a
detailed, longitudinal relationship with" Plaintiff.  (R. at 20-
21.)  The ALJ did not make the same note about the assessment of
Dr. Khona.  However, the mere fact that Dr. Khona may have also
had a shortened relationship with Plaintiff does not, standing
alone, make the opinion of Dr. Pressman or Dr. Tobe any more
convincing.

The ALJ simply did not find Dr. Tobe's assessment of
Plaintiff's alleged dysthmia and neurological disabilities to be
supported by the record.  Furthermore, Dr. Tobe's assessment was
also contradictory of Dr. Hairston's, a treating physician, as to
Plaintiff's alleged psychological infirmity.  (R. at 180.)  The
ALJ did not find Dr. Pressman's diagnosis of Plaintiff being
"100% permanent and totally disabled" to be supported by the
record.  (R. at 20.)  Instead, the diagnosis was contradictory of
the ALJ's other findings of fact, which are supported by
substantial evidence.  Dr. Tobe and Dr. Pressman's diagnoses were
unsupported by the record and as such not entitled to significant
weight.

26

Therefore, the ALJ's assignment of weight to the various pieces of medical evidence from non-treating physicians is supported by substantial evidence and was a proper exercise of his discretionary authority.

### 3.   **Whether the ALJ failed to properly determine the Plaintiff's residual functional capacity**

Plaintiff argues that the ALJ failed to specifically identify Plaintiff's functional limitations or restrictions, and as a result Plaintiff's residual functional capacity ("RFC") was improperly calculated.  RFC is an assessment of "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," one that "only considers functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments."  (SSR 96-8p, 1.)  The RFC is expressed in terms of "exertional levels" of work, such as sedentary, medium, and heavy.  (Id.)  "Medical impairments and symptoms, including pain, are not intrinsically exertional or nonexertional.  It is the functional limitations or restrictions caused by medical impairments and their related symptoms that are categorized as exertional or nonexertional."  (Id.)

The testimony of a vocational expert should be considered by an ALJ.  Santise v. Schweiker, 676 F.2d 925 (3d Cir. 1982);

Singleton v. Schweiker, 551 F. Supp. 715 (E.D. Pa. 1982).
However, the ALJ need only rely on "competent evidence," not
necessarily the opinion of a vocational expert, in determining
whether Plaintiff can perform "sedentary work." Gilliard v.
Heckler, 786 F.2d 178, 183 (3d Cir. 1986).  The definition of
"sedentary work" is set out in the Regulations:

> Sedentary work involves lifting no more than
> 10 pounds at a time and occasionally lifting
> or carrying articles like docket files,
> ledgers, and small tools.  Although a
> sedentary job is defined as one which
> involves sitting, a certain amount of walking
> and standing is often necessary in carrying
> out job duties.

20 C.F.R. § 404.1567(a).

The ALJ found that Plaintiff's RFC consisted of being able
to lift and carry up to ten pounds occasionally and less than ten
pounds frequently, sit for about six hours (in one hour
intervals), stand for about two hours (in thirty minute
intervals), walk for about one hour (in twenty minute intervals),
frequently reach horizontally with his upper extremities and
frequently handle and feel with his hands.  (R. at 22-23.)  The
Vocational Expert, Mr. Schmidt ("VE"), testified that a
hypothetical individual with the aforementioned RFC could perform
a significant amount of sedentary jobs existing in the regional

or national economy, such as "surveillance systems monitor,"

"microfilming document preparer," and "call out operator."   (R.

at 54-55.)

Here, the ALJ found that Plaintiff's "chronic pain" and

"dysthymic disorder" did not impose limitations upon Plaintiff's

ability to perform basic work-related activities, and this

finding was based on substantial evidence, as discussed above.

More specifically, the ALJ found that in spite of any exertional

or non exertional limitations, Plaintiff was still able to

perform a significant range of jobs in the "sedentary" category,

and this was based on "competent evidence."   (R. at 23);

Gilliard, 786 F.2d at 183.

An individual's RFC takes into account any impairment that

would limit their ability to work.  Consequently, if an alleged

impairment does not limit an individual's ability to perform

basic work functions, it would not be a factor in their RFC

calculation.  Using the VE's testimony, Plaintiff's "statements

concerning his impairments and their impact on his ability to

work," "the degree of medical treatment required," his demeanor

at the hearing, "the reports of the treating and examining

practitioners" and his "medical history as a whole," the ALJ

constructed Plaintiff's RFC.  (R. at 21.)  Plaintiff's alleged

dysthmic disorder and chronic pain were found to not impose any

29

limitations on his ability to perform basic work-related activities, and therefore their inclusion into the ALJ's RFC calculation was uncalled for.

Therefore, the ALJ did not fail to properly determine the Plaintiff's RFC, as that determination was based on "competent" and "substantial" evidence.

### 4.  Whether the ALJ relied on flawed vocational expert testimony

Plaintiff argues that the vocational expert's answers to questions elucidated from the ALJ's hypothetical did not accurately address the hypothetical, and as a result the ALJ failed to follow the requisite "function-by-function" assessment. Specifically, Plaintiff contends that neither the ALJ nor the VE clarified how long the hypothetical individual would have for breaks (after sitting or standing for the relevant interval of time), and whether or not these breaks would conform to the "usual and customary breaks allowed by employers in the national economy." (Pl. Br. at 23-24.)

First and foremost, a district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams, 970 F.2d at 1182. The VE's testimony as to the existence of jobs that Plaintiff could perform is substantial evidence, and certainly significant in determining

whether the Commissioner has carried her burden at step five of the sequential analysis.  Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988); Sias v. Sec'y of Health and Human Servs., 861 F.2d 475, 480-81 (6th Cir. 1988); Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

The VE based his testimony on the hypothetical individuals posed by the ALJ.  (R. at 54-59.)  Plaintiff has offered no evidence showing that any of the VE's answers were incorrect or inaccurate because of the ALJ's hypotheticals, and as such this case is dissimilar to that of the situation presented in Burns v. Barnhart, 312 F.3d 113 (3d Cir. 2002).  In Burns, the ALJ's hypothetical was factually deficient because it did not address the claimant's "intellectual functioning limitations."  Id. at 124.  Here, however, the ALJ formulated the hypothetical situations using Plaintiff's RFC, which the Court has already deemed valid.  The ALJ calculated Plaintiff's RFC using Plaintiff's own testimony about his capabilities and medical data from the exhibits presented.  (R. at 22).

Plaintiff argues that the ALJ's hypothetical was flawed, the VE's answers to the hypothetical questions were inaccurate, and further, that the ALJ erred in relying on the VE's inaccurate testimony.  Plaintiff, however, has not substantiated any of these claims with evidence in the record.  Therefore, the Court

31

finds that the ALJ did not rely on "flawed" VE testimony.

> **5.** **Whether the administrative record provides sufficient basis for an award of summary judgment in favor of Plaintiff**

Plaintiff's final, generic argument is that he is entitled to "summary judgment" because he is in fact "disabled."

The ALJ's findings were based on substantial evidence.  The ALJ found that Plaintiff was not credible.  At all times the ALJ was using the correct legal standards for his analysis.  As such, an award of summary judgement would be inappropriate for this case, and the ALJ was correct in finding Plaintiff to be "not disabled" for the purpose of the DIB analysis.

## III.  CONCLUSION

For the reasons stated above, the Commissioner's finding that Plaintiff is "not disabled" will be affirmed.  An accompanying Order will be entered.

DATE: May 22, 2007          **s/ Noel L. Hillman**

At Camden, New Jersey        NOEL L. HILLMAN
                             United States District Judge